UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

Midwest Railcar Corporation,

              Plaintiff,

          -v-

Everest Railcar Services, Inc. and
Steven J. Hendricks,

              Defendants.

----------------------------------------------------------------

**ANSWER WITH COUNTERCLAIMS**

CASE NO.  1:16-cv-00604-AKH

In response to the complaint (the "Complaint") of the plaintiff, Midwest Railcar Corporation ("Midwest" or "Plaintiff"), the defendants, Everest Railcar Services, Inc. ("Everest") and Steven J. Hendricks ("Hendricks)(collectively "Defendants"), through their undersigned attorneys, hereby answer said complaint as follows:

1.     No response is required to the allegations in paragraphs "1," "5," "6," "14," "31" and "38" of the Complaint.  To the extent a response is required, Defendants deny same.

2.     Lack sufficient knowledge or information as to the truth of the allegations in paragraphs "2," "16," "25," "28," "32" and "39" of the Complaint, and, therefore, Defendants deny same.

3.     Admit the allegations contained in paragraphs "3," "4" "7" "8," "9," "10," "11," "12," "13" and "15" of Plaintiff's Complaint.

4.     State that the terms, conditions and contents of the agreements and documents referenced in paragraphs "17," "18," "19," "40" and "41" speak for themselves.  To the extent the Plaintiff attempts to modify those terms, conditions and contents, Defendants deny each and every allegation contained in said paragraph.

5.     Admit that a letter signed by Defendant Hendricks was sent on May 28, 2015, but deny each and every remaining allegation in paragraph "20" of the Complaint.

6.     Deny each and every allegation contained in paragraph "21," "22," "26," "29" "30," "33," "34," "35" "36" "42" and "43" of the Complaint.

7.     Admit that Plaintiff sent a letter dated December 1, 2015 to Defendants, but deny each and every remaining allegation in paragraph "23" of the Complaint.

8.     Admit that Hendricks sent an email, but deny each and every remaining allegation in paragraph "24" of the Complaint.

9.     Admit that Plaintiff sent a letter to Defendants dated December 18, 2015, but deny each and every remaining allegation in paragraph "27" of the Complaint.

10.     Defendants deny each and every other allegation contained in the Complaint which has not already been responded to herein.

## FIRST AFFIRMATIVE DEFENSE

11.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

12.     Plaintiff's Complaint is barred by the principles of waiver, estoppel and/or laches.

## THIRD AFFIRMATIVE DEFENSE

13.     Plaintiff breached and/or failed to perform its obligations under the Leases.

## FOURTH AFFIRMATIVE DEFENSE

14.     Plaintiff failed to negotiate in good faith with Defendants.

## FIFTH AFFIRMATIVE DEFENSE

15.     The terms of the Leases are vague, ambiguous and/or in conflict with one another.

## SIXTH AFFIRMATIVE DEFENSE

16.     Any alleged election by Defendant Everest to renew or purchase the railcars subject to the Leases does not apply to the rail cars subject to Schedule 90005 or Schedule 90006, given that Defendant Everest's May 28, 2015 letter was sent more than 360 days prior to the expiration of those Schedules.

## AS AND FOR ITS COUNTERCLAIMS AGAINST MIDWEST, EVEREST ALLEGES AS FOLLOWS:

17.     Everest is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

18.     Defendant Steven J. Hendricks is a resident of the State of Arkansas.

19.     Plaintiff Midwest is an Illinois corporation with its principal place of business in Maryville, Illinois. Midwest is a wholly owned subsidiary of Marubeni Corporation.

20.     The matter in controversy, exclusive of interest and costs, exceeds $75,000.00. Complete diversity of citizenship exists between Plaintiff and Defendants, and this Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 2201.

21.     Venue is proper in this Court pursuant to the Rail Equipment Net Leasing Agreement No. 21812-90000 dated as of January 6, 2011 (the "Lease Agreement").

## BACKGROUND OF DISPUTE BETWEEN EVEREST AND MIDWEST

22.     Everest is a railway company that leases railcars to shippers and short-line railroads. Steven J. Hendricks is principal of Everest.

23.     On January 6, 2011, Everest executed the Lease Agreement with Banc of America Leasing & Capital, LLC ("BAL"). A true copy of the Agreement is attached hereto as **Exhibit "A."**

24.     On January 22, 2011, Steven J. Hendricks, principal of Everest, executed a Guaranty, guaranteeing Everest's performance of the Agreement. A true copy of the Guaranty is attached hereto as **Exhibit "B."**

25.     Pursuant to the Lease Agreement, Everest leased railcars from BAL by executing certain Schedules, which would set forth a description of the railcars, the number of railcars leased, the specific marks and numbers required by the Association of American Railroads, the

lease term, the rental charge, the specific commodity or freight to be carried within said railcar, and any specific restrictions on use.

26.     On February 1, 2011, Everest and BAL executed a Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90001, wherein Everest leased 25 railcars ("Schedule 90001"). A true copy of Schedule 90001 is attached hereto as **Exhibit "C."**

27.     Schedule 90001 terminated by its terms on February 5, 2016.

28.     On February 8, 2011, Everest and BAL executed a Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90002, wherein Everest leased 25 railcars ("Schedule 90002"). A true copy of Schedule 90002 is attached hereto as **Exhibit "D."**

29.     Schedule 90002 terminated by its terms on March 5, 2016.

30.     On February 8, 2011, Everest and BAL executed an Amended and Restated Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90003, wherein Everest leased 25 railcars ("Schedule 90003"). A true copy of Schedule 90003 is attached hereto as **Exhibit "E."**

31.     Schedule 90003 terminated by its terms on April 5, 2016.

32.     On February 22, 2011, Everest and BAL executed an Amended and Restated Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90004, wherein Everest leased 25 railcars ("Schedule 90004"). A true copy of Schedule 90004 is attached hereto as **Exhibit "F."**

33.     Schedule 90004 terminates by its terms on May 5, 2016.

34.     On March 4, 2011, Everest and BAL executed an Amended and Restated Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90005, wherein Everest leased 50 railcars ("Schedule 90005"). A true copy of Schedule 90005 is attached hereto as **Exhibit "G."**

35.     Schedule 90005 terminated by its terms on June 5, 2016.

36.     On March 21, 2011, Everest and BAL executed an Amended and Restated Schedule to Rail Equipment Net Leasing Agreement, Schedule Number 90006, wherein Everest leased 50 railcars ("Schedule 90006," and together with Schedule 90001, Schedule 90002, Schedule 90003, Schedule 90004, and Schedule 90005, collectively the "Schedules"). A true copy of Schedule 90006 is attached hereto as **Exhibit "H."**

37.     Schedule 90006 terminated by its terms on July 5, 2016.

38.     On or about July 31, 2013, BAL assigned the Agreement and the Schedules (collectively, the "Leases") to Midwest.

39.     Midwest is a direct competitor of Everest.

40.     On May 19, 2015, Steven J. Hendricks, on behalf of Everest, contacted Midwest via telephone to inquire about rates and terms with regard to potentially renewing the Leases. Mr. Hendricks was unable to reach anyone at Midwest but left a voicemail.

41.     The Leases allow Everest to extend the Lease Term (as that term is defined in the Leases) or to purchase the railcars by giving less than 360 days, but more than 180 days, notice to the lessor.

42.     The Schedules state that Everest must notify Midwest in writing not less than 180 days prior to expiration of the specific Schedule of Everest's intent to return the railcars, or to exercise a purchase or renewal option.

43.     In the event Everest elected to extend the Lease Term (as that term is defined in the Leases), the renewal term is required to be agreed upon by the parties, at the fair market rental value.

44.     Specifically, the Schedules provide as follows:

> Extension; Purchase Options. Provided no Event of Default has occurred and remains uncured, and upon Lessee having provided Lessor with written notice not more than 360 days or less than 180 days prior to the expiration of the Lease Term, Lessee may irrevocably elect to:

(i)    extend the Lease Term as to all and not less than all of the Units under this Schedule *for a renewal period to be agreed upon by Lessee and Lessor* for an amount equal to the then fair market rental value of the Units, as determined Lessor...; or

(ii)    purchase all of Lessor's right, title and interest in and to all, but not less than all, of the Units under this Schedule, free from all liens and encumbrances created by Lessor, but otherwise on an "AS-IS, WHERE-IS," quitclaim basis, for a purchase price equal to the then fair market value of the Units, as determined by Lessor... (emphasis added). See Ex. E, Sec. 11.

45.    As for fair market rental value, the Leases define the term as:

The amount which would be obtained in an arm's-length transaction between an informed and willing lessee (*other than a lessee currently in possession*) and an informed and willing lessor, each under no compulsion to lease; (emphasis added). Ex. E, Sec. 11.

46.    In the event Everest elected to purchase the railcars, the purchase price is the fair market value.

47.    As used in the Leases, fair market value for purposes of purchasing the railcars means:

The amount which would be obtained in an arm's-length transaction between an informed and willing buyer-user (*other than a buyer currently in possession or a used equipment or scrap dealer*) and an informed and willing seller, each under no compulsion to buy or sell,... (emphasis added). Ex. E, Sec. 11.

48.    On May 28, 2015, Everest sent a letter to Midwest, indicating a willingness to either renew the Lease or to purchase the railcars upon receiving specific terms of the renewal or the purchase. A true copy of the May 28, 2015 correspondence is attached hereto as **Exhibit "I."**

49.    On July 8, 2015, Defendant Hendricks spoke with Tom Renard, a sales representative from Midwest, who indicated that he would have to speak with Plaintiff's President and Chief Executive Officer, Richard Murphy, before they could discuss terms of any

renewal or purchase of the railcars. Although Mr. Renard indicated he would call Defendant Hendricks back with more specifics, he never did.

50.     Having had no response from Plaintiff, on November 30, 2015 and December 1, 2015, a representative of Everest sent e-mails to Midwest's officers notifying Midwest that since proper terms were not agreed to for renewal or purchase, Everest was not going to exercise its option to renew the Leases or purchase the railcars, and that Everest was going to return the railcars that were leased pursuant to Schedule 90001, Schedule 90002, Schedule 90003, and Schedule 90004.

51.     On December 1, 2015, Midwest sent a letter to Everest, requesting that Everest indicate whether it will renew the Lease or purchase the railcars. A true copy of the December 1, 2015 correspondence is attached hereto as **Exhibit "J."**

52.     In response, Allan Lindy, Vice President of Everest, sent an email to Midwest on December 1, 2015, requesting pricing terms for a month-to-month renewal after the initial term of the Leases expired.

53.     In this email, Mr. Lindy explained that similar cars have recently been marketed to Everest at a rate of $275 per car per month on a full service basis.

54.     On December 4, 2015, Richard Murphy informed Defendants that Midwest was interested in a five-year renewal term of the Leases at a rental price in "the high 300s" per railcar.

55.     Thereafter, Midwest continued to offer alleged fair market value purchase and renewal rates to Everest that were well-above and beyond the actual fair market value renewal or purchase rates for the railcars at issue.

56.     Moreover, Midwest failed to negotiate with Everest regarding the term of any renewal as is required under the Leases.

57.     As such, Everest further communicated to Midwest that it intended to return the railcars that are the subject of Schedule 90005 and Schedule 90006.

58.     Pursuant to the Schedules, upon notice of Everest's intention to return railcars, Everest is to return the railcars to a mutually agreeable location.  Specifically, the Schedules provide:

> **Lessee shall return the Railcars to Lessor at Lessee's expense
> to a mutually acceptable interchange point.**(emphasis original).
> See e.g. Ex. E, Sec. 11.

59.     Conflictingly, Annex II to the Schedules provides that the cars "shall be returned to the location(s) designated by Lessor..." See e.g. Ex. E, Annex II, Sec. 2.

60.     On December 18, 2015, counsel for Midwest sent Everest a notice of default, giving Everest 30 days to cure said alleged default. A true copy of the December 18, 2015 correspondence is attached hereto as **Exhibit "K."**

61.     On January 5, 2016, counsel for Everest submitted notice to Midwest's counsel that Everest intended to cure its alleged default by electing to return the railcars. A true copy of the January 5, 2016 correspondence is attached hereto as **Exhibit "L."**

62.     Thereafter, on January 8 and 27, 2016, February 24, 2016, March 18, 2016, April 15, 2016, May 13, 2016 and June 15, 2016, Midwest corresponded with Everest to demand that Everest store the railcars for 180 days pursuant to the Leases and to designate Transco Railway Products, Oelwein, IA – Iowa Northern Railway delivery as the return location for the railcars subject to the Schedules without negotiating with Everest concerning a mutually agreeable return location.  Copies of these letters are attached as **Exhibit "M."**

63.     Moreover, in the letters attached as Exhibit "M," Midwest specifically reserved the right to unilaterally "designate an alternative return location at a later date prior to the conclusion of the required storage period upon reasonable notice to Everest," further indicating

its unwillingness to select a return location based on mutual agreement as is required under the Leases. See Ex. M.

**EFFECT OF DISPUTE ON EVEREST'S RELATIONSHIP WITH HALLIBURTON**

64.     On or about February 17, 2006, Everest Halliburton Energy Services, Inc. ("Halliburton") entered into the Railcar Master Lease Agreement ("Halliburton Lease Agreement"), a copy of which is attached as **Exhibit "N."**

65.     Since 2006, Everest and Halliburton have entered into various schedules to the Halliburton Lease Agreement, whereby Everest has leased railcars to Halliburton.

66.     At or about the time Everest signed the Lease Agreement with BAL on January 31, 2011, Everest and Halliburton entered into a series of schedules to the Halliburton Lease Agreement, sub-leasing to Halliburton the railcars that are currently at issue under the Leases with Midwest.

67.     Specifically, on January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 07 ("Halliburton Schedule 7"), a copy of which is attached as **Exhibit "O."**

68.     In Halliburton Schedule 7, Everest sub-let the railcars subject to Schedule 90001 to Halliburton.

69.     On January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 08 ("Halliburton Schedule 8"), a copy of which is attached as **Exhibit "P."**

70.     In Halliburton Schedule 8, Everest sub-let the railcars subject to Schedule 90002 to Halliburton.

71.     On January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 09 ("Halliburton Schedule 9"), a copy of which is attached as **Exhibit "Q."**

72.     In Halliburton Schedule 9, Everest sub-let the railcars subject to Schedule 90003 to Halliburton.

73.     On January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 10 ("Halliburton Schedule 10"), a copy of which is attached as **Exhibit "R."**

74.     In Halliburton Schedule 10, Everest sub-let the railcars subject to Schedule 90004 to Halliburton.

75.     On January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 11 ("Halliburton Schedule 11"), a copy of which is attached as **Exhibit "S."**

76.     In Halliburton Schedule 11, Everest sub-let the railcars subject to Schedule 90005 to Halliburton.

77.     On January 31, 2011, Everest and Halliburton entered into Railcar Master Lease No. HES-106 Supplement No. 12 ("Halliburton Schedule 12") a copy of which is attached as **Exhibit "T."**

78.     In Halliburton Schedule 12, Everest sub-let the railcars subject to Schedule 90006 to Halliburton.

79.     The terms of the "Halliburton Lease Agreement" together with "Halliburton Schedule 7," "Halliburton Schedule 8," "Halliburton Schedule 9," "Halliburton Schedule 10," "Halliburton Schedule 11," and "Halliburton Schedule 12" (collectively the "Halliburton Subleases") are substantially similar to the terms of the Leases between Everest and Midwest.

80.     Everest has notified Halliburton that it intends to return the railcars to Midwest under the Leases.

81.     Midwest was and is aware of the Halliburton Subleases.

82.     In fact, Halliburton made rent payments under the Halliburton Subleases to a lock box operated and/or controlled by Midwest.

83.     Upon receipt of rent payments from Halliburton via the lock box, Midwest deducted rental payments owed by Everest to Midwest and sent the remaining balance to Everest.

84.     Likewise, upon information and belief, Midwest also has its own lease agreements with Halliburton, whereby it directly leases railcars to Halliburton.

85.     Until the railcars are returned under the Halliburton Subleases, Halliburton has an obligation to pay rent to Everest.  The Halliburton Lease Agreement provides:

> Until [the railcars are] returned to Lessor in the condition required by the terms of this Lease, Lessee shall continue to pay rent at the daily rent equivalent under this Lease…See Ex. N, ¶ 14.

86.     Thus, according to the Halliburton Subleases, the railcars are not returned until the storage period, if any, has concluded and the railcars are transported to a return location designated by Everest.

87.     To date, upon information and belief, the railcars subject to the Halliburton Subleases and the Leases have been stored, but have not yet been sent to the return location, in part, because Midwest has reserved its alleged right to unilaterally change the return location.

88.     Since the railcars subject to the Halliburton Subleases have not yet been returned, Halliburton must continue to pay rent under the Halliburton Subleases.

89.     Everest, however, has not received any rent payments from Midwest as paid through the lock box by Halliburton since on or about December 30, 2015.

90.     Upon information and belief, Halliburton has ceased paying rent under the Halliburton Subleases and/or Midwest has converted the rent payments sent by Halliburton to the lock box.

91.     Either way, by failing to distribute rent payments to Everest deposited to the lock box by Halliburton, Midwest has intentionally interfered with the Halliburton Subleases and has induced and/or otherwise caused Halliburton not to perform its obligations under the Halliburton Subleases.

92.     Thus, Halliburton is in breach of its obligations to Everest under the Halliburton Subleases by failing to pay rent until return of the railcars, thereby damaging Everest.

93.     Halliburton has also informed Everest that it does not intend to renew any of the schedules to the Halliburton Lease Agreement, thereby eliminating any prospective business relationships with Everest.

94.     Upon information and belief, Everest, who has done business with Halliburton for the last 10 years, could have renewed the Halliburton Subleases and its other schedules with Halliburton at the conclusion of those leases.

95.     Halliburton, however, no longer wishes to do business with Everest, in part, because Everest was unable to designate a location where the railcars at issue could be both stored and returned as a costs savings to Halliburton.

96.     Moreover, as the status of the return of the railcars to Midwest continues to remain uncertain insofar as Midwest alleges that it may change the return location from Transco Railway Products, Oelwein, IA – Iowa Northern Railway delivery to another location and Midwest continues to drag out the return of the railcars, Everest's goodwill with Halliburton has been damaged.

97.     Likewise, upon information and belief, Midwest has also used its knowledge of Everest's confidential rental prices to its own advantage, and has entered into direct leases with Halliburton since the dispute over the Leases arose.

98.     Everest invested significant skill, labor and goodwill in developing its relationship with Halliburton over the course of the last 10 years, and it had an expectation that the relationship with Halliburton would continue into the future.

99.     Midwest has intentionally interfered with the prospective business relationship between Everest and Halliburton insofar as it has converted rent payments made by Halliburton to Everest; has misappropriated Everest's skill, labor and goodwill in developing its relationship with Halliburton for Midwest's own commercial advantage; has destroyed Everest's goodwill as far as Halliburton is concerned; has, upon information and belief, misappropriated Everest's pricing schedule in an effort to undercut Everest's prices on direct leases between Halliburton and Midwest; and has otherwise interfered with Everest's current and prospective relationship with Halliburton.

100.    Upon information and belief, Halliburton has signed leases directly with Midwest since the dispute between Midwest and Everest over the Leases arose.

101.    Midwest's interference in the relationship between Everest and Halliburton caused damage to the relationship between Everest such that Halliburton no longer wants to work with Everest in any capacity.

102.    As a result, Everest has and continues to suffer damages.

**FIRST COUNTERCLAIM - BREACH OF CONTRACT**

103.    Everest repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.    The Leases are valid, binding, and enforceable agreements against Midwest.

105.    Midwest has defaulted pursuant to the Leases by failing to negotiate in good faith with Everest regarding the renewal of the Leases or purchase of the cars; failing to negotiate the renewal period; failing to establish a fair market rental value of the railcars for renewal of the Leases; failing to establish a fair market value of the railcars for purchase of the railcars under

-13-

the Leases; failing to negotiate with Everest to determine a mutually agreeable return location for the railcars; failing to promptly negotiate with Everest regarding the return of the railcars; and Midwest has otherwise breached the Leases.

106.    Everest has complied with all conditions precedent to enforce its rights and remedies pursuant to the Leases.

107.    Everest has suffered and will continue to suffer damages as a result of Midwest's breach of the Leases.

108.    Everest requests and is entitled to a money judgment in an amount to be determined at trial, but which is believed to exceed $500,000.00 for all damages accrued and accruing due to Midwest's breach of contract as described herein.

## SECOND COUNTERCLAIM – CONVERSION

109.    Everest repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    Since on or about December 30, 2015, Midwest has failed and refused to distribute Halliburton's rent payments delivered to the lockbox operated and/or controlled by Midwest over to Everest without proper justification and has unlawfully withheld such funds from Everest, notwithstanding that demand has been made by Everest that payment in full be made immediately.

111.    By intentionally and unlawfully withholding the aforesaid funds, Midwest has interfered to the exclusion of Everest's rights in said funds.

112.    As such, Everest is entitled to an order compelling Midwest to deliver to Everest the $137,401.92 it received from Halliburton for rent payments since December 30, 2015 due under the Halliburton Subleases, which represents Everest's portion of the total amount paid by Halliburton in rent under the Halliburton Subleases, plus additional rents, interest, costs and disbursements.

113.    In the alternative, Everest is entitled to judgment against Midwest in the amount of $137,401.92, representing the value of the converted property at issue from December 30, 2015 to the present, plus additional rents, interest, costs and disbursements.

## THIRD COUNTERCLAIM – UNFAIR COMPETITION

114.    Everest repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    Everest invested significant skill, labor and goodwill into its relationship with its customer, Halliburton.

116.    By using Everest's skill, labor and goodwill invested in its relationship with Halliburton to its own commercial advantage, as well as Everest's confidential pricing schedule in an effort to undercut Everest's prices on direct leases between Halliburton and Midwest, Midwest is engaging in unfair competition in violation of the New York common law prohibition on unfair competition.

117.    Everest has been and continues to be irreparably damaged by Defendant's unfair competition in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with costs, disbursements and expenses.

## FOURTH COUNTERCLAIM – TORTIOUS INTERFERENCE WITH CONTRACT

118.    Everest repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119.    The Halliburton Subleases were valid agreements between Everest and Halliburton.

120.    At all relevant times, Midwest had knowledge of the Halliburton Subleases.

121.    Upon information and belief, Midwest intentionally interfered in the Halliburton Subleases by causing and/or inducing Halliburton to breach the Halliburton Subleases with Everest.

122.    But for Midwest's interference, Halliburton would not have breached the Halliburton Subleases with Everest.

123.    Midwest's interference in the Halliburton Subleases caused Everest to suffer damages in an amount to be proven at trial, but which is believed to exceed $1,000,000.00.

<b>FIFTH COUNTERCLAIM – TORTIOUS INTERFERENCE WITH<br>PROSPECTIVE BUSINESS RELATIONSHIP</b>

124.    Everest repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    Everest has had a business relationship with Halliburton for the last 10 years.

126.    Midwest knew of the relationship between Everest and Halliburton and intentionally interfered in that relationship.

127.    In interfering with the relationship between Everest and Halliburton, Midwest acted solely out of malice and/or converted rent payments made by Halliburton to Everest, misappropriated Everest's skill, labor and goodwill in developing its relationship with Halliburton for Midwest's own commercial advantage, destroyed Everest's goodwill as far as Halliburton is concerned, and otherwise interfered with Everest's current and prospective relationship with Halliburton.

128.    Midwest's interference in Everest's prospective business relationship with Halliburton caused Everest to suffer damages in an amount to be proven at trial, but which is believed to exceed $2,500,000.00.

WHEREFORE, Defendants demand judgment dismissing Midwest's complaint, and awarding them costs, disbursements and such other and further relief as the Court may deem just and proper. Defendants also demand judgment on their Counterclaims against Midwest as follows:

A. On Everest's First Counterclaim for breach of contract, in the amount of $500,000.00 or such other amount to be proven at trial, including costs, disbursements and expenses;

B. On Everest's Second Counterclaim for conversion, in the amount of $137,401.92 or such other amount to be proven at trial, including additional rents, costs, disbursements and expenses;

C. On Everest's Third Counterclaim for unfair competition, in the amount of $1,000,000.00 or such other amount to be proven at trial, including costs, disbursements and expenses;

D. On Everest's Fourth Counterclaim for tortious interference with contract, in the amount of $1,000,000.00 or such other amount to be proven at trial, including costs, disbursements and expenses;

E. On Everest's Fifth Counterclaim for tortious interference with prospective business relationship, in the amount of $2,500,000.00 or such other amount to be proven at trial, including costs, disbursements and expenses; and

F. Such other and further relief as the Court may deem just and proper.

Dated: July 22, 2016
     Syracuse, New York

                            HARRIS BEACH PLLC

            By: _____
                            David M. Capriotti, Esq.
                            David P. Martin, Esq.
                            Lauren H. Seiter, Esq.
                            *Attorneys for Defendant Everest Railcar Service, Inc.* and Defendant Steven Hendricks
                            333 West Washington Street, Suite 200
                            Syracuse, NY 13202
                            (315) 423-7100