```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/13/17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

MIDWEST RAILCAR CORPORATION,

                Plaintiff,

v.

EVEREST RAILCAR SERVICES, INC. and
STEVEN J. HENDRICKS,

                Defendants.

------------------------------------------------------------- x

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS**

16 Civ. 604 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff Midwest Railcar Corporation's ("Midwest") amended complaint, and Defendants Everest Railcar Services, Inc.'s and Steven J. Hendricks' (together, "Everest") counterclaims, allege contradictory positions regarding a series of railcar leases. Midwest has moved to dismiss Everest's counterclaims. *See* Dkt. No. 36. In order to rule on Midwest's motion, I must consider the merits of both the complaint and the counterclaims. In the context of this overall review, I first hold that Midwest has adequately stated a breach of contract claim for Everest's alleged repudiation of its prior exercise of an irrevocable option to either renew the leases or purchase the railcars. I dismiss, however, for lack of legal and factual sufficiency, Everest's counterclaims for breach of contract, conversion, unfair competition, tortious interference with contract, and tortious interference with prospective business relationship.

## FACTUAL BACKGROUND

### I. The First Amended Complaint

      Midwest's First Amended Complaint ("FAC") complains that Everest breached a series of lease agreements for approximately 200 railcars and that Defendant Hendricks, Everest's president, breached his personal guaranty of Everest's performance. In 2011, Everest

1

leased the railcars from Banc of America Leasing & Capital, LLC ("BofA Leasing") under a Master Lease Agreement and six schedules (the "Leases"), and Hendricks personally guaranteed Everest's obligations under the Leases. BofA Leasing later assigned its rights and obligations under the Leases to Midwest. The Leases were to expire in accordance with their terms on six dates between February 13, 2016 and July 4, 2016.

The Leases gave Everest an option, exercisable by irrevocable notice 360 days (but not less than 180 days) before the lease expiration date, either to (a) extend the term of the lease for a renewal period to be agreed on by the parties and at fair market value "as determined by the Lessor," or (b) to purchase the railcars at fair market value "as determined by the Lessor." Midwest alleges that Everest timely exercised this option via written letter on May 28, 2015, "irrevocably electing to either renew the Leases or purchase the railcars." FAC ¶ 20.

On July 8, 2015, Midwest contacted Everest via telephone and responded that the fair market value at the time was in the "mid-$500s per railcar per month" for rentals, and "between $70,000.00 and $80,000.00 per railcar" for purchase. *Id.* ¶ 21. On December 1, 2015, Midwest asked Everest via letter whether it intended to purchase the railcars or renew the lease, to which Everest responded by purporting to terminate or cancel its prior irrevocable election. *Id.* ¶¶ 23-24. On December 18, 2015, Midwest declared Everest in default, and on January 5, 2016, Everest stated its intention to return the railcars at the end of each lease term. *Id.* ¶¶ 32-33.

Midwest alleges that it refrained from marketing the railcars to other parties after Everest's May 28 exercise of the option, and that the market for railcars significantly deteriorated between that time and Everest's repudiation on December 1, 2015. Midwest seeks recovery under five claims for relief: breach of the Leases by Everest for repudiating its irrevocable election to purchase or renew the lease the railcars, breach of Hendricks' guaranty

agreement, promissory estoppel, failure to negotiate in good faith, and negligent misrepresentation. Midwest alleges that it suffered damages by the deteriorated price of railcars during the period between Everest's exercise of the option and its purported cancellation of that exercise. As a remedy, Midwest seeks specific performance and unspecified money damages.

## II. Everest's Counterclaims

Everest's answer denies liability and alleges counterclaims. Everest alleges that its May 28, 2015 letter was not an invocation of an irrevocable option, but merely indicated "a willingness to either renew the Lease or to purchase the railcars upon receiving specific terms of the renewal or the purchase." Counterclaims ¶ 103. Everest agrees that the parties spoke on July 8, 2015, but alleges that the Midwest representative informed Everest that he would have to speak to Midwest's CEO "before they could discuss terms of any renewal or purchase of the railcars." Everest further alleges that Midwest never called back with more specifics. *Id.* ¶ 104. When Midwest failed to respond, Everest, by emails of November 30 and December 1, 2015, advised Midwest that it would not renew the lease or purchase the railcars, but would instead return the railcars upon expiration of each lease. *Id.* ¶ 105.

Following Midwest's December 1 letter, which seemingly ignored Everest's emails offering to the return the railcars and instead inquired as to whether Everest intended to lease or purchase, the parties engaged in further discussion over potential lease or purchase terms, but without agreement. Everest alleges that during these discussions, it informed Midwest that similar railcars had been marketed to Everest for $275 per month on a full service basis, under which the lessor is responsible for maintenance and repairs. Everest further alleges that its leases with Midwest are net leases, under which the lessee is responsible for such upkeep, and that the difference between the fair market value of a full service lease and a net lease is approximately $75 per car. *Id.* ¶¶ 108-112. On December 4, 2015, however, Midwest informed

3

Everest that it was interested in a five-year renewal term at a rental price in the "high 300s" per railcar. *Id.* ¶ 113. Negotiations continued thereafter but, Everest alleges, "Midwest continued to offer alleged fair market value purchase and renewal rates to Everest that were well-above and beyond the actual fair market value renewal or purchase rates for the railcars at issue." *Id.* ¶ 114.

Having concluded that Midwest was not negotiating in good faith, Everest then offered to return the railcars in accordance with the lease terms. *Id.* ¶ 116. In response, on December 18, 2015, Midwest sent Everest a notice of default via written letter, which charged Everest with refusing "to consummate a renewal or purchase," stated that Everest's offer to return the railcars constituted repudiation of its irrevocable exercise of the option, and gave Everest thirty days to cure its default, either by executing renewal leases enclosed with the letter, or purchasing at $72,500 per railcar. Midwest also asserted that Everest's attempt to return the railcars was itself a breach of the parties' agreement because Section 13 of the Master Lease Agreement requires Everest to provide Midwest with at least 180 days written notice of its intention to return the railcars. Counterclaims, Ex. K.

Everest responded on January 5, 2016, again offering to return the railcars and stating that its offer to return the railcars constituted cure. Counterclaims, Ex. L. Midwest responded by instructing Everest to store the railcars for 180 days and to then return the railcars to a specified location: Transco Railway Products in Oelwein, Iowa. Counterclaims ¶ 121. Everest alleges, however, that the Leases require the lessee to return the railcars to a "mutually acceptable interchange point." *Id.* ¶ 117. Based on these facts, Everest alleges that Midwest breached the Leases by failing to negotiate in good faith the terms of the renewal or purchase, and by unilaterally designating the return location.

Everest also asserts four causes of action relating to damages it claims to have incurred as a result of Midwest's interference with subleases (the "Subleases") of the railcars that Everest entered into with Everest Halliburton Energy Services, Inc. ("Halliburton"). The parties – Everest, Midwest and Halliburton – entered into an agreement under which Halliburton made rent payments owed under the Subleases to a lock box controlled by Midwest. Midwest, in turn, after deducting rental payments owed by Everest to Midwest, then remitted the remaining balance to Everest. *Id.* ¶¶ 141-42.

The Subleases provide that Halliburton must pay rent until the railcars are returned to Everest. Halliburton has not yet returned the railcars, and therefore continues to owe rent to Everest. *Id.* ¶¶ 144-46. However, since December 30, 2015, Everest has not received any remittal payments from Midwest as paid through the lock box by Halliburton. *Id.* ¶¶ 147-49. Everest alleges that Midwest has converted Halliburton's rent payments by withholding the excess from Everest or, in the alternative, that Halliburton has ceased making payments to the lock box as a result of Midwest's interference with Everest's contractual relationship with Halliburton. Everest asserts four counterclaims against Midwest relating to Everest's relationship with Halliburton: conversion, unfair competition, tortious interference with contract, and tortious interference with prospective business relationship.

### III. The Relevant Lease Terms

New York law governs interpretation of the relevant contracts, as the Master Lease Agreement provides that "this Agreement and any Schedule hereto shall be interpreted under, and its performance shall be governed by, the laws of the States of New York." Master Lease Agreement § 28.

Regarding Everest's option to renew the leases or purchase the railcars, Section 11 of each of six Leases provides, as relevant, as follows:

> Extension; Purchase Options. Provided no Event of Default has occurred and remains uncured, and upon Lessee having provided Lessor with written notice not more than 360 days or less than 180 days prior to expiration of the Lease Term, Lessee may irrevocably elect to:
>
> (i) extend the Lease Term as to all and not less than all of the Units under this Schedule for a renewal period to be agreed upon by Lessee and Lessor for an amount equal to the then fair market value of the Units, as determined by Lessor, plus applicable taxes, payable monthly by Lessee to Lessor on the first day of each month during the extension term. ...; or
>
> (ii) purchase all of Lessor's right, title and interest in all, but not less than all, of the Units under this Schedule, free from all liens and encumbrances created by Lessor, but otherwise on an "AS-IS, WHERE-IS," quitclaim basis, for a purchase price equal to: the then fair market value of the Units, as determined by Lessor; *plus* all Base Rent installments, late charges and other amounts then due and owing under the Lease; *plus* all applicable taxes, assessments and other charges[.]

Leases § 11. For purposes of purchasing the railcars, the Leases define "fair market value" as the "amount which would be obtained in an arm's-length transaction between an informed and willing buyer-user (other than a buyer currently in possession or a used equipment or scrap dealer) and an informed and willing seller, each under no compulsion to buy or sell[.]" *Id.* The Leases similarly define "fair market rental value" as the "amount which would be obtained in an arm's-length transaction between an informed and willing lessee (other than a lessee currently in possession) and an informed and willing lessor, each under no compulsion to lease." *Id.*

Section 13 of the Master Lease Agreement provides that "prior to the expiration of the Lease Term of any Lease, Lessee shall provide a minimum of 180 days irrevocable written notice to Lessor of its intention to return all but not less than all of the Units." Master Lease Agreement § 13.

Section 12 of the Leases provides that the "Lessee shall return the Railcars to Lessor at Lessee's expense to a mutually acceptable interchange point." Leases § 12.

6

However, Section 2 of Annex II to each Lease, entitled "Supplemental Return Conditions," states that "upon expiration or any earlier termination of the Lease, all Equipment shall be returned to the location(s) designated by Lessor in the same condition as when first accepted by Lessee." Leases, Annex II § 2.

Lastly, the Master Lease Agreement provides that failure "to observe or comply with any other covenant or obligation under any lease," as well as "any attempted repudiation, breach or default of any guaranty of Lessee's obligations hereunder or any lease," both constitute an "Event of Default" under the agreement. Master Lease Agreement § 20.

## DISCUSSION

### I. Midwest States a Claim for Breach of Contract Due to Everest's Repudiation of Its Exercise of the Irrevocable Option

Everest's letter of May 28, 2015 states the following: "This letter will serve as our written notice to either renew the lease at terms to be negotiated or exercise a purchase option at an amount to be negotiated." Ex. I. This is more than an inquiry. It is an irrevocable exercise of the option that Section 11 of the Leases grants to Everest, the lessee. It also constitutes an unambiguous rejection of the alternative option granted to Everest in Section 13 of the Master Lease Agreement, which permits Everest to return the railcars to Midwest provided that Everest gives at least 180 days' notice of its intent to return the railcars. Reading these two provisions together, Everest had to decide not less than 180 days prior to the expiration of each Lease whether to return the railcars, or to purchase or lease them again. Everest's letter of May 28, 2015 not only functioned as an exercise of the option to renew or purchase, but as a rejection of the option to return the railcars at the expiration of each lease.

Section 11 of the Leases sets the purchase or lease renewal price as the "amount equal to the then fair market value ... as determined by Lessor." Everest's May 28 letter sought

7

to vary this term by seeking renewal or purchase at terms and amount "to be negotiated." This variance had no legal effect with respect to the price, and Midwest was entitled to ignore Everest's effort to change the process for renewal. The terms of the option in this respect are sufficiently definite, for fair market value can be determined objectively, and Midwest's right to determine fair market value is limited by such objective determination. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 110 (N.Y. 1981) (option provisions that base renewal price on an "objective extrinsic … standard on which the amount [is] made to depend" are sufficiently definite and thus enforceable); *Best Way Realty v. Perlegis*, 831 N.Y.S.2d 351 (N.Y. Sup. Ct. 2006) (an "option's use of fair market value as a purchase price is a permissible reference to an external objective standard and is sufficiently definite to be enforceable.").

Thus, Midwest has stated a claim for breach of contract as a result of Everest's purported revocation of its exercise of the irrevocable option.

## II. Everest Fails to State a Claim for Breach of Contract

Everest alleges that Midwest breached the parties' agreement in two respects. First, Everest alleges that Midwest failed to negotiate in good faith the terms of Everest's lease renewal or purchase. Second, Everest alleges that when it offered to return the railcars, Midwest unilaterally selected the return location in breach of Section 12 of the Leases, which provides that the railcars shall be returned to a "mutually acceptable interchange point." Both theories fail as a matter of law.

"A breach of the duty of good faith and fair dealing is considered a breach of contract." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). Everest argues that following the July 8 telephone call, Midwest "failed to participate in negotiations from July 2015 to December 1, 2015," which Everest presents as evidence of Midwest's failure to negotiate in good faith. However, the only specific fact alleged is that during the July 8 telephone call,

8

Midwest's representative "indicated he would call Defendant Hendricks back with more specifics," but that "he never did." Counterclaims ¶ 104. Even accepting this allegation as true, it is not suggestive of a refusal to negotiate in good faith on the part of Midwest. Everest does not allege, for example, that it ever followed up with Midwest after the July 8 phone call or that it made any further effort to finalize the terms of the lease renewal or purchase, even though it was the party that invoked the option. Rather, the parties appear to have mutually ignored each other throughout this period; their next interaction was on November 30, 2015, when Everest informed Midwest that it no longer sought to renew the lease or purchase the railcars.

When the parties finally did engage in negotiations in early December 2015, Midwest first proposed a five-year lease at a rental price in the "high 300s" per railcar. Midwest contends this is evidence of Midwest's failure to negotiate in good faith, presumably because this figure was higher than fair market value. Midwest counters that this proposal could not have been made in bad faith because the Leases provide that fair market value is to be "determined by the Lessor." That may be true, but Midwest still had an obligation to propose a lease or purchase price that reflected "the then fair market value of the Units." It would not be in good faith to propose a figure inconsistent with fair market value, which is an objective, determinable number, for "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) (quoting *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (1st Dep't 2003)).

Still, Everest's claim fails for two reasons. First, merely alleging that Midwest's initial proposal was above fair market value does not permit an inference that Midwest provided that figure to purposefully frustrate and derail the negotiations. It is true that when negotiating

9

the terms of a binding preliminary agreement, a party must refrain from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). On the other hand, the implied covenant of good faith and fair dealing "does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972)).

Beyond this single specific allegation, Everest alleges only that following Midwest's December 4 proposal, "Midwest continued to offer alleged fair market value purchase and renewal rates to Everest that were well-above and beyond the actual fair market value renewal or purchase rates for the railcars at issue." Counterclaims ¶ 114. But this type of generalized allegation is insufficient, for to "state a claim for breach of contract for failure to negotiate in good faith, a plaintiff must allege the specific instances or acts that amounted to the breach; generalized allegations and grievances will not suffice[.]" *L-7 Designs*, 647 F.3d at 431 (internal citations and quotation marks omitted). Everest's reference to "continued" offers in excess of fair market value is insufficient because Everest does not identify what those offers were, when they were made, how Everest responded to them, or what benchmark Everest used to conclude that Midwest's offers were in excess of fair market value.

Second, even if Everest had alleged more than one specific example of a bad faith offer, Everest fails to allege in non-conclusory terms that any such offers were in fact above fair market value. As a preliminary matter, the parties do not address the date on which fair market value is to be calculated. Section 11 of the Leases refers to "the *then* fair market value of the

10

Units." Leases § 11 (emphasis added). Presumably the word "then" refers to the date on which the option was exercised, but there is sufficient ambiguity in the term to allow the parties to prove parol evidence to clarify this ambiguity. I need not resolve this question of interpretation, however, for Everest has not alleged what the actual fair market value was at any point during the relevant time period.

Everest alleges only that on some unspecified date, a third party marketed "similar cars" to Everest "at a rate of $275 per car per month," Counterclaims ¶ 108, and that this offer concerned a full service lease, which is typically priced approximately $75 higher than a net lease. This single fact is insufficient to establish what the fair market value was for net lease railcars during this period, particularly in light of Midwest's allegation that "the market for railcars significantly deteriorated" between May 28, 2016 (the date of Everest's invocation of the option) and December 1, 2015 (the date of Everest's repudiation). FAC ¶ 25. Everest therefore fails to plausibly allege a claim for failure to negotiate in good faith. *See 19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 165 (S.D.N.Y. 2016) (dismissing claim for breach of duty of good faith and fair dealing where complaint lacked any allegation that compensation at issue deviated from fair market value and where "the allegation regarding the royalty rate by itself being below fair market value is lacking in detail that would allow a finding of bad faith.").

Lastly, Everest alleges that Midwest breached the Leases by unilaterally selecting a return location for the railcars, instead of negotiating a "mutually acceptable interchange point," as Section 12 of the Leases requires. Midwest counters that Section 2 of Annex II of the Leases provides that "upon expiration or any earlier termination of the Lease, all Equipment shall be returned to the location(s) designated by Lessor[.]" These two provisions appear to conflict with each other. However, I need not resolve that conflict because Everest fails to allege

11

that it ever objected to Midwest's designated return location, or otherwise made any attempt to negotiate the return location with Midwest, as Section 12 of the Leases provides for. In fact, in Everest's January 5, 2016 letter, it asked Midwest to "please notify [Everest] of an acceptable interchange point for said returns," which strongly suggests that Everest had elected to defer to Midwest's proposed return location. Regardless, absent any allegation that Everest attempted to negotiate the return location but was rebuffed by Everest, this claim fails.

For these reasons, Everest's breach of contract claim is dismissed.

### III. Everest Fails to State a Claim for Conversion

Everest alleges that Midwest converted funds paid by Halliburton properly owed to Everest by failing to remit to Everest excess payments received from Halliburton. Specifically, Everest alleges that as of December 30, 2015, it no longer "received any rent payments from Midwest as paid through the lox box by Halliburton." Counterclaims ¶ 148.

"To establish a cause of action for conversion under New York law, a plaintiff must show (1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001) (internal quotation marks omitted). "An action for conversion of money may be made out where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Thys v. Fortis Sec. LLC*, 903 N.Y.S.2d 368, 369 (1st Dep't 2010).

Everest's conversion claim fails because it has not shown "legal ownership or an immediate superior right of possession" to the payments that Halliburton deposited into the lock box subsequent to Everest's repudiation of its exercise of the option. Amendments to Everest's

12

sublease agreement with Halliburton (the "Subleasing Consent and Amendment"), which all parties involved signed and agreed to, set out the terms under which Midwest was obligated to remit to Everest excess payments received from Halliburton. As relevant here, Midwest had no obligation to remit excess payments to Everest in the event that Everest attempted to repudiate any of its obligations under Leases, for such repudiation constituted an Event of Default under Section 20 of the Master Lease Agreement.

Specifically, the Subleasing Consent and Amendment provides that upon any Event of Default, Everest "shall not be entitled to receive any amount that would otherwise constitute Excess Funds," and permits Midwest to hold such amounts as "cash collateral ... to be applied to the Obligations in such order and manner as determined by [Midwest] in its sole discretion." Subleasing Consent and Amendment § 9. These terms make clear that Midwest was under no obligation to remit excess funds to Everest as of December 30, 2015, the date it alleges that Midwest ceased making remittal payments. Everest's conversion claim fails even if it is ultimately determined that Everest did not in fact breach the contract by purporting to repudiate its invocation of the option, for the terms further provide that "the determination of the amount of Excess Funds owing to [Everest] shall be made by [Midwest] in accordance with the Agreement and the related documents and instruments, and its determination therefore shall be conclusive in the absence of manifest error." *Id.* Here, given the unambiguous nature of both Everest's exercise of the option and its subsequent repudiation, Midwest's belief that an Event of Default occurred was not manifest error.

For these reasons, Everest's conversion claim is dismissed.

### IV. Everest Fails to State a Claim for Unfair Competition

Everest alleges that Midwest unfairly competed with Everest by (1) exploiting the skill, labor and goodwill that Everest invested into its relationship with Halliburton in order to

13

gain commercial advantage; and (2) misappropriating Everest's confidential pricing schedule with Halliburton in order to unfairly undercut Everest's pricing.

Regarding the first of these two allegations, Everest alleges only that it "invested significant skill, labor and goodwill in developing its relationship with Halliburton." Counterclaims ¶ 157. It does not further identify what this "skill, labor and goodwill" consisted, how Everest invested it, or how it relates to Everest's relationship with Halliburton. Nor does Everest allege *how* Midwest exploited this skill, labor or goodwill to gain commercial advantage. This allegation is conclusory, and therefore will not be credited. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

In support of its allegation that Midwest misappropriated confidential pricing information, Everest alleges only that Midwest "misappropriated Everest's pricing schedule in an effort to undercut Everest's prices on direct leases between Halliburton and Midwest," and that Midwest "used its knowledge of Everest's confidential rental prices to its own advantage, and has entered into direct leases with Halliburton since the dispute over the Leases arose." Counterclaims ¶¶ 156, 158.

Unfair competition claims sounding in misappropriation "often involve[] misappropriate of trade secrets or ideas." *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 303 (E.D.N.Y. 2012); *see also Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 311 (N.D.N.Y. 2007) ("Courts have found that the misappropriation of detailed, internal customer information can give rise to a claim of unfair competition, but only when that customer information has several of the attributes of a trade secret and is being used in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.").

Here, the price Everest charged Halliburton to sublease railcars does not qualify as a trade secret because Everest has not alleged any non-conclusory facts indicating that the fees it charged Halliburton were confidential or that Halliburton was under any obligation not to disclose that information to third-parties. The pricing schedule therefore "cannot be considered to be of a genuinely 'secret' nature," for the "mere fact that it suited plaintiff that the information be kept from other bidders does not confer trade secret status upon the information." *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 15 (1st Dep't 1998); *see also Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62, 67 (3d Dep't 2003) ("pricing data" does not qualify as a trade secret); *TNS Media Research, LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 315 (S.D.N.Y. 2013) ("Price lists ... are not, as a matter of law, protected as trade secrets."). The reason for this general rule is that pricing information is often accessible directly from customers who "routinely disclose such information to rival vendors in order to foster price competition." *Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.*, 875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008); *see also Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) (plaintiff's "discount prices are not trade secrets because they are well known" and because "customers in this narrow industry liberally talk about discounts of the different manufacturers with which they work in order to negotiate the lowest prices.").

Under certain circumstances, a misappropriation claim may have merit even if trade secrets are not involved. For example, "a claim may be based on misappropriation of client lists, internal company documents, and business strategies," but only if "'wrongful or fraudulent tactics [are] employed.'" *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011) (quoting *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387 (N.Y. 1972)).

Everest does not allege any specific facts regarding how Midwest employed "wrongful or fraudulent tactics" to undercut Everest's pricing. Indeed, regardless of whether trade secrets are involved or not, a "plaintiff asserting an unfair competition claim under New York common law must also show that defendant acted in bad faith." *Luv n' Care, Ltd. v. Mayborn USA, Inc.*, 898 F.Supp.2d 634, 643 (S.D.N.Y.2012). Even accepting as true that Midwest used the pricing information to its advantage, Everest has not alleged any facts indicating that Midwest acted in bad faith. It does not allege, for example, that Midwest obtained the pricing information by using improper means, nor does it allege that Midwest used the pricing information for the specific purpose of injuring Everest.

As a competitor of Everest in the railroad industry, Midwest had no common law or contractual obligation to refrain from competing with Everest's customers, for it is well-established that competition alone does not establish the kind of "commercial immorality" that gives rise to an unfair competition claim. *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982).

For these reasons, Everest's unfair competition claim is dismissed.

## V. Everest Fails to State a Claim for Tortious Interference with Contract

A party alleging tortious interference with contract must "establish (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional interference with the contract, and (4) damages." *Waste Serv., Inc. v. Jamaica Ash & Rubbish Removal Co.*, 691 N.Y.S.2d 150, 152 (2d Dep't 1999). Here, Everest alleges that "by failing to distribute rent payments to Everest deposited to the lock box by Halliburton, Midwest has intentionally interfered with the Halliburton Subleases and has induced and/or otherwise caused Halliburton not to perform its obligations under the Halliburton Subleases." Counterclaims ¶ 150. Everest also alleges that Halliburton no longer wants to do business with

Everest because "Everest was unable to designate a location where the railcars at issue could be both stored and returned as a cost savings to Halliburton." Counterclaims ¶ 154. Finally, Everest alleges that "Halliburton has signed leases directly with Midwest since the dispute between Midwest and Everest over the Leases arose." Counterclaims ¶ 159.

Everest fails to state a claim for tortious interference with contract because Midwest was contractually permitted to engage in the acts that Everest alleges amount to "intentional inference." As discussed above (in the context of Everest's conversion claim), Midwest was permitted to cease remitting excess payments to Everest following Everest's repudiation. A claim for tortious interference with contract, however, "cannot rest on conduct that is incidental to some other lawful purpose." *Aniero Concrete Co. v. N.Y. City Const. Auth.*, 1997 WL 3268, at *19 (S.D.N.Y. Jan. 3, 1997) (internal quotation marks omitted); *see also Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000) ("[T]he action that induces the alleged breach cannot have been one that the accused tortfeasor was privileged to take."). Likewise, Everest's claim that it was "unable to designate" a return location that would bring Halliburton "cost savings" is irrelevant because Everest had no such contractual right.

Because Everest alleges no specific facts indicating that Midwest intentionally interfered with its sublease with Halilburton, Everest's claim for tortious interference with contract is dismissed.

### VI. Everest Fails to State a Claim for Tortious Interference with Prospective Business Relationship

To state a claim for tortious interference with prospective business relationship, a plaintiff must allege "(1) the existence of a prospective business relationship; (2) defendants' knowledge of, and interference with, such relationship; (3) defendant's malice or use of wrongful

17

means; and (4) harm to plaintiff." *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 333 (S.D.N.Y. 2008). "'Wrongful means' include physical violence, fraud or mis-representation, civil suits and criminal prosecutions." *Schoolcraft v. City of N.Y.*, 103 F. Supp. 3d 465, 525 (S.D.N.Y. 2015). To constitute wrongful means, "generally, the conduct must amount to a crime or an independent tort, or must have been engaged in 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *Technest Holdings, Inc. v. Deer Creek Fund LLC*, 2008 WL 3449941, at *10 (S.D.N.Y. Aug. 12, 2008) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004)).

This claim fails for the same reason that the tortious interference with contract claim fails: Midwest was legally permitted to do the things that Everest identifies as tortious interference with its relationship with Halliburton. As such, Everest's allegations cannot satisfy the requirement that Midwest utilized "wrongful means" to achieve the alleged interference.

Accordingly, Everest's claim for tortious interference with prospective business relationship is dismissed.

## CONCLUSION

For the reasons stated herein, Midwest's motion to dismiss Everest's counterclaims is granted. The Clerk shall terminate the motion (Dkt. No. 36). The deficiencies of the counterclaims do not appear to be curable and are therefore dismissed without leave to amend. A status conference will be held on May 12, 2017 at 10 a.m. The parties shall propose a discovery plan for my consideration at the conference.

SO ORDERED.

Dated: April 13, 2017
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge

18